UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOVNATON KRIKORIAN,

      Plaintiff,                      Civil Action No. 15-14128

           v.                      District Judge Victoria A. Roberts
                                                Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff Hovnaton Krikorian ("Plaintiff) brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") cessation of Disability Insurance Benefits ("DIB") under the Social Security Act.  The parties have filed cross-motions for summary judgment.  Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).   For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #20] be DENIED.

## PROCEDURAL HISTORY

      On September 2, 2008, Plaintiff applied for DIB, alleging disability as of May 19, 2008 due to T-cell lymphoblastic lymphoma (Tr. 13, 174).  On September 23, 2008, Plaintiff

was found disabled on the basis that his condition met Listing 13.06A of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Leukemia) (Tr. 13). On February 9, 2012, the SSA found that due to the condition's remission, Plaintiff was no longer disabled (Tr. 13).

Plaintiff requested an administrative hearing, held on February 4, 2014 (Tr. 29). Administrative Law Judge ("ALJ") Patrick MacLean presided. Plaintiff, unrepresented by counsel, testified (Tr. 39-58, 75-78), as did Plaintiff's former wife, Danielle Krikorian (Tr. 58-66), and Vocational Expert ("VE") David Holwerda (Tr. 66-73). On May 23, 2014, ALJ MacLean found that as of February 9, 2012, Plaintiff was capable of unskilled work at all exertional levels (Tr. 17, 23).

On September 25, 2015, the Appeals Council denied review (Tr. 1-3). Plaintiff filed the present action on November 24, 2015.

## BACKGROUND FACTS

Plaintiff, born April 13, 1968, was 43 at the time of the February 9, 2012 finding of medical improvement by the SSA (Tr. 13, 174). Prior to the onset of disability, he was a construction worker (group leader) (Tr. 21). He alleges ongoing disability due to psychological and cognitive limitation (Tr. 20).

### A. Plaintiff's Testimony

*Plaintiff's former wife, Danielle Krikorian, a layperson, stated that she would act as Plaintiff's representative for the hearing* (Tr. 32).

Plaintiff offered the following testimony:

Plaintiff joined the Marine Corps directly after graduating from high school (Tr. 39). He lived by himself in Dearborn, Michigan in a two-story house since his children and former wife moved out in June, 2010 (Tr. 40-41). He regularly drove to his mother's house for dinner, or, his mother or father would bring him food (Tr. 41-42). He was able to vacuum, clean the bathrooms, and do laundry (Tr. 32). He grocery shopped once or twice a month (Tr. 43-44). He had a valid driver's license and drove several times a week (Tr. 44). His eight-year-old son stayed with him on weekends (Tr. 44). He attended church once a week but did not belong to any social organizations (Tr. 46).

Plaintiff experienced memory problems (Tr. 47-48). His mother was listed on his checking account and she reminded him to pay bills (Tr. 47-48). Plaintiff watched television regularly but did use his computer more than a few times a month (Tr. 48). He had a cell phone but not a "smart phone" (Tr. 49). He had two close friends whom he spoke to "at least every other week" (Tr. 50).

Plaintiff's wife and children left him because he was being "really inconsiderate" and "yelling . . . a lot" (Tr. 51). He had been referred to a psychologist by his oncologist for "brain damage" from the cancer treatment but had not had inpatient psychiatric treatment (Tr. 51). Plaintiff changed his behavior after the family conflicts began but it was too late to repair his marriage (Tr. 52).

Plaintiff earned income driving a shuttle van in the last quarter of 2011 and 2012, but quit the job because he "nervous" driving vans (Tr. 55-56). He did not take any medication

for psychological problems (Tr. 57). He had not received mental health treatment since being referred for evaluation at the end of the cancer treatment (Tr. 58).

### B. Testimony of Plaintiff's Former Wife

Ms. Krikorian offered the following testimony:

She had known Plaintiff for a total of 20 years (Tr. 58). They were separated in December, 2010 (Tr. 59). She disputed Plaintiff's testimony that his house was clean and stated that Plaintiff did not quit the van-driving job, but rather, was terminated for incompetence (Tr. 60). She stated that during Plaintiff's chemotherapy he was "violent," "aggressive," and that she had to bail him out of jail for shoplifting (Tr. 61-62). After the personality changes, Plaintiff was referred for two neurological studies (Tr. 63). She left Plaintiff after fearing for the safety of her children (Tr. 63). Plaintiff was currently in danger of losing his home because he had failed to pay the bills (Tr. 63). Plaintiff had been prescribed Wellbutrin but most likely did not take it (Tr. 64).

Ms. Krikorian opined that Plaintiff was incapable of even simple, repetitive work due to tendency to go from "calm and complacent to violent and aggressive in a matter of moments" (Tr. 65). She allowed her son to stay with Plaintiff but was "not fully confident" that he was protected (Tr. 65).

-4-

### C. Medical Evidence

### 1. Treating Sources

In August, 2010, Tanya Ergh Sherman, Ph.D., L.P. noted that while the condition of leukemia was in remission, Plaintiff reported increased emotional lability following chemotherapy (Tr. 284). Plaintiff reported feelings of sadness and felt that he was "inconsiderate" and "rude" to others (Tr. 284). He also reported concentrational problems (Tr. 284). Plaintiff's wife reported that he was verbally aggressive and had a "low frustration tolerance" (Tr. 285).

Dr. Sherman observed fluent speech and an appropriate affect (Tr. 285). She noted that Plaintiff expressed frustration when presented with a novel task (Tr. 285). She noted that he was "focused and diligent" (Tr. 286). She found that the IQ of 91 was eight points lower than "premorbid intellectual functioning" (Tr. 286). She noted that Plaintiff's motor speed and manual dexterity were mildly to moderately impaired for the left (dominant) hand and moderately impaired for the right (Tr. 286). Processing speeds were in the average to mildly impaired ranges (Tr. 286). Language functioning was in the average and "high average" range (Tr. 287). Executive functioning achievement was mostly normal with "poor impulse control" and "family discord" (Tr. 287). Dr. Sherman noted that Plaintiff was able to drive and could perform could perform most activities of daily living (Tr. 288). She recommended behavioral management psychotherapy, noting that "a return to competitive employment may be possible" (Tr. 289). The following month, she saw Plaintiff for a

2:15-cv-14128-VAR-RSW   Doc # 23   Filed 01/02/17   Pg 6 of 23   Pg ID 523

"feedback session" and arranged for Plaintiff to begin psychotherapy (Tr. 283).

    March, 2011 treating records from Karmanos Cancer Institute state that Plaintiff reported that "behavioral issues" had "greatly improved" after undergoing psychotherapy (Tr. 290). The same month, Plaintiff reported that the motor problems had resolved (Tr. 332). Treating notes from June, 2011 state that Plaintiff had been in remission since May, 2010 and was currently "able to travel and enjoy his family" but continued "to experience cognitive impairment" characterized by "delayed thinking and impaired problem-solving" (Tr. 294). Treating staff noted "good insight and judgment" with "some delayed word-finding and decreased mental acuity" (Tr. 295). In October, 2011, Plaintiff reported "improved" behavior issues (Tr. 329).

    In March, 2012, Andrew A. Muskovitz, M.D. noted that in August, 2010, Dr. Sherman found behavioral changes including "mild cognitive disorder" secondary to radiation treatment (Tr. 328). Dr. Muskovitz noted "a few performances that were below expectation," including "mild to moderately impaired motor speed and manual extermity, mildly impaired processing speed," moderate difficulty performing novel tasks, and "low average to borderline impaired learning in the context of intact . . . memory skills" (Tr. 328).

    The same month, Darren Fuerst, Ph.D. examined Plaintiff, noting Plaintiff's denial of current memory problems (Tr. 338). However, Plaintiff's wife reported memory problems, personality changes, poor hygiene, and aggressiveness (Tr. 338). Dr. Fuerst noted that Plaintiff was fully oriented, achieved average IQ scores, and had fluent speech (Tr. 339-

-6-

341).  Plaintiff scored above average in alphanumeric sequencing (Tr. 342).  Dr. Fuerst noted that personality testing showed that Plaintiff was "psychologically well-adjusted" or, could be "under-reporting symptoms" (Tr. 342).  List learning was "low average to mildly impaired" (Tr. 343).  Dr. Fuerst recommended behavioral therapy, recommending that Plaintiff "remain on disability" due to impairment of memory and executive functions (Tr. 343).  Dr. Fuerst noted that his findings were based on "available medical records" and the interview with Plaintiff and his wife (Tr. 338).

In September, 2012, treating physician Gregory H. Marcarian, M.D. found no anxiety, depression, memory loss, or confusion (Tr. 406).  He found that Plaintiff was alert and fully oriented (Tr. 407).  October, 2012 treating records note Plaintiff's report of "no significant complaints" and that memory loss problems had resolved (Tr. 373).

In February, 2013, Jason Valent, M.D. opined that Plaintiff experienced "significant cognitive impairment," making a return to the former work with heavy machinery "very unlikely" (Tr. 363).  He also found that the cognitive impairment "would make it very difficult for retraining to be done" (Tr. 363).  He found that Plaintiff would not experience difficulty with activities of daily living or with household safety (Tr. 84).  In October, 2013, Dr. Marcarian, noting that Plaintiff's parents had become his guardians, opined that "it would be impossible" for Plaintiff "to seek and maintain employment in his current condition" (Tr. 366).  Dr. Marcarian's notes from the same month show that Plaintiff experienced anxiety due to "a disability hearing coming up in two weeks" and that Plaintiff felt that he was

-7-

"unable to work due to memory, behavior and competency limitations" (Tr. 399). However, Dr. Marcarian's records from the same day state that Plaintiff did not exhibit anxiety, memory loss, or confusion (Tr. 400). The following month, Dr. Valent reiterated his February, 2013 opinion that Plaintiff was not re-trainable (Tr. 363, 377). The same month, Jeffrey Forman, M.D. found that Plaintiff exhibited "some expressive aphasia, short-term memory problems, and difficulty with motor skills as evidence by his getting dressed and undressed" (Tr. 378).

## 2.  Non-Treating Sources

In January, 2012, Leonidas Rojas, M.D. evaluated Plaintiff on behalf of the SSA, noting an unremarkable physical examination (Tr. 300-305). Dr. Rojas noted that the condition of leukemia was in remission (Tr. 301). The same month, Terrance A. Mills, Ph.D. completed a psychological evaluation on behalf of the SSA, noting Plaintiff's report that he had been "brain . . . damaged from [chemotherapy treatment]" (Tr. 306). Plaintiff reported that he needed reminders to pay bills and was apt to forget events from the previous day (Tr. 306). Plaintiff reported that he coped with memory problems by putting appointments on a calender (Tr. 307). Dr. Mills found that based on the examination and treating records, Plaintiff had short-term memory problems, delayed thinking and impaired problem solving" (Tr. 308). He assigned a GAF of 45 but found that Plaintiff could manage his benefit funds[1]

---

[1]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th

(Tr. 308).

The following month, Rose Moten, Ph.D. completed a Psychiatric Review Technique based on the treating and consultative records, finding that as a result of organic mental and affective disorders, Plaintiff experienced mild restriction in activities of daily living and social functioning, and moderate deficiencies in concentration, persistence, or pace (Tr. 309-310, 312, 319). Dr. Moten noted that Plaintiff did not exhibit significant memory problems at the consultative examination (Tr. 321). She found that Plaintiff had "the cognitive and adaptive ability to engage in simple, repetitive work activity" (Tr. 321). Dr. Moten also completed a mental residual functional capacity assessment, finding that Plaintiff experienced moderate limitation in the ability to understand, remember, and carry detailed instructions; maintain concentration for extended periods; and accept instruction and criticism from supervisors (Tr. 323-324). She noted that Plaintiff engaged in a wide variety of daily activities and was capable of doing "serial 7s" at the consultative examination (Tr. 325).

In June, 2012, Colin King, Ph.D. completed a second mental residual functional capacity assessment on behalf of the SSA, finding that Plaintiff experienced moderate limitation in the ability to respond to workplace changes and mild limitation in accepting criticism (Tr. 345). His findings were otherwise identical to Dr. Moten's February, 2012

---

ed.2000)("*DSM-IV-TR*").

findings (Tr. 323-326).  Dr. King found that Plaintiff's mental limitations would not preclude

"simple unskilled tasks" (Tr. 346).  Consistent with Dr. Moten's findings, Dr. King found

mild limitation in activities of daily living and social functioning, and moderate limitation

in concentration, persistence, or pace (Tr. 358).   Dr. King concluded that Plaintiff was

capable of carrying out "one or two-step instructions" but that "interactions with supervisors,

coworkers, and the public should not be extensive" (Tr. 360).

### D.  Vocational Expert Testimony

VE David Holwerda classified Plaintiff's past relevant work as a operating engineer

as skilled and exertionally medium and work as a construction worker, semiskilled/heavy[2]

(Tr. 67, 70).  The ALJ posed the following set of limitations to the VE, describing a

hypothetical individual of Plaintiff's age, education, and past relevant work:

> Please assume a person . . . who is able to perform work at all exertional
> levels; avoid all use of moving machinery; avoid all exposure to unprotected
> heights; whose work would be limited to a simple, routine, and repetitive tasks,
> one or two-step tasks; employed in a low-stress job, defined as having only
> occasional decision-making required; with only occasional changes in the
> work setting; who would be limited to occasional, only occasional, interaction
> with the public and with coworkers.  Can an individual with these limitations

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

perform Claimant's past relevant work as Claimant performed it or as customarily performed? (Tr. 72).

The VE testified that given the above limitations, the individual would be unable to perform Plaintiff's past relevant work but could perform the light exertional work of a production worker or assembler (2,200 jobs in the regional economy); the exertionally medium job of production worker (1,500); and the heavy work of a production worker helper (1,000) (Tr. 72). The VE testified further that if the same individual "[d]ue to severe mental impairments," could not stay on tasks 80 percent of an eight-hour workday, no work would be available (Tr. 73). The VE stated that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 73).

### E.    The ALJ's Decision

ALJ MacLean noted that at the "comparison point decision" ("CPD") of September 23, 2008, Plaintiff was found  disabled due to leukemia (Tr. 13).   The ALJ found that as February 9, 2012, Plaintiff's disability ended (Tr. 13).  The ALJ cited neuropsychological examination notes by Dr. Sherman, who found an "average range of scores across most cognitive domains" (Tr. 13).  The ALJ also cited Dr. Sherman's finding of "mild" cognitive disorder due to cancer treatment and Plaintiff's report that he was independent in basic activities (Tr. 13).  The ALJ noted Dr. Muscovitz's March, 2011 finding that the behavioral issues had mostly resolved (Tr.  14).   The ALJ accorded "little weight" to Dr. Mills' consultative findings, noting that none of the treating records showed "halting speech" as found by Dr. Mills (Tr. 15).

The ALJ found that as of February 9, 2012, Plaintiff experienced the severe impairments of "status/post leukemia; cognitive disorder; and mood disorder" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16). He found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 16). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for work at all residual levels as of February 9, 2012 with the following non-exertional limitations:

> [T]he claimant should avoid all use of moving machinery and unprotected heights. The claimant is limited to simple, routine, and repetitive 1 or 2-step tasks; employed in a low stress job defined as having only occasional decision making and only occasional changes in the work setting. The claimant is limited to only occasional interactions with the public and coworkers (Tr. 17).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of bench assembler, hand packager, and security manager (Tr. 32).

The ALJ discounted Plaintiff's allegations of continued disability (Tr. 20-21). The ALJ noted that a June 5, 2012 Function Report prepared by Plaintiff and his former wife after the cessation of disability stated that he was unable to care for his personal needs, get along with others, clean his house, perform simple arithmetic, and relied on family members to complete all of his daily activities (Tr. 20-21). The ALJ noted that the June, 2012 representations contrasted sharply with Plaintiff' and his former wife's August, 2010 statement to Dr. Sherman that he was independent in all activities of daily living including

-12-

meal preparation, driving, travel, and interaction with family (Tr. 21). The ALJ noted that in 2010, Plaintiff and his wife reported that "personality changes had improved and that he was doing well" (Tr. 21).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

-13-

## FRAMEWORK FOR CESSATION OF BENEFITS CLAIMS

In determining whether an individual continues to be disabled, the ALJ employs a eight-step sequential analysis in regard to DIB claims and a seven-step analysis for SSI. See 20 C.F.R. § § 404.1594, 416.994.  In regard to DIB claims, at Step One, the ALJ determines whether the individual is engaging in substantial gainful activity.  A finding that the claimant is performing substantial gainful activity results in a finding of non-disability.  At Step Two the ALJ considers whether the individual had an impairment or combination of impairments which meets or equals the severity of a listed impairment.   If the ALJ finds such impairment(s), the inquiry continues. At Step Three, the ALJ determines whether there has been medical improvement. At Step Four, the ALJ considers whether  the medical improvement relates to the individual's ability to perform work.  At Step Five, the ALJ determines if there has been no medical improvement or the medical improvement is not related to the individual's ability to perform work.  At Step Six, the ALJ determines whether the individual's current impairments are severe.   The absence of a severe impairment directs a non-disability finding. At Step Seven, the ALJ determines whether the claimant's abilities allow him to perform his past relevant work.   A finding that he can perform such work results in a non-disability finding.  At Step Eight, the ALJ determines whether the individual can perform other work in light of his age, education, work experience and RFC. A finding that he is capable of performing other work results in a non-disability finding.   Steps two through eight of a DIB claim are identical to the seven-step process used in SSI claims.  *See*

-14-

§ § 404.1594, 416.994.

In contrast to an initial disability determination, "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy v. Astrue,* 247 Fed.Appx. 761, 765, 2007 WL 2669153, *4 (6th Cir. September 7, 2007)(*citing Griego v. Sullivan,* 940 F.2d 942, 944 (5th Cir.1991)).   In a cessation of benefits case, "the central question is whether the claimant's medical impairments have improved to the point where [s/he] is able to perform substantial gainful activity." *Kennedy* at 764; 42 U.S.C. § 423(f)(1).   A "medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement must be supported by an improvement "in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.*; *Kennedy* at 765.

## ANALYSIS

### The Residual Functional Capacity

Plaintiff argues that the RFC found in the administrative opinion (Tr. 17) did not account for his full degree of "behavioral problems" resulting from chemotherapy. *Plaintiff's Brief*, 14, *Docket #20,* Pg. ID 483.  He contends that the medical records and testimonial evidence supports a more restrictive RFC.  *Id.* at 13-17.

-15-

"RFC is what an individual can still do despite his or her limitations." SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at 7. The analysis must include the non-exertional limitations. 20 C.F.R. § 404.1545. However, "'[a]lthough a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v. Commissioner of Social Sec.,* 30 Fed.Appx. 542, 547–548, 2002 WL 343402, *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. CSS,* 251 F.3d 153, slip op., 4 (Table)(3rd Cir. December 19, 2000)(punctuation added). "'[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo* at slip op. at 5).

Plaintiff does not dispute the finding that he did not experience physical limitations but contends that the RFC did not reflect his true degree of psychological limitation. In regard to the psychological limitations, the ALJ crafted an RFC limiting Plaintiff to "simple, routine, and repetitive 1 or 2-step tasks" in a "low stress" position requiring "only occasional decision making and only occasional changes in the work setting" and "only occasional interactions with the public and coworkers" (Tr. 17).

-16-

Plaintiff contends that the RFC does not adequately address his cognitive limitations. He notes that both Dr. Sherman (Tr. 289), and Dr. Fuerst (Tr. 343) recommended cognitive behavioral therapy "as a prerequisite" to competitive employment. *Plaintiff's Brief* at 13-14, *Docket #20,* Pg. ID 482. Plaintiff points out that the record does not show that he received behavioral therapy. *Id.* He also notes that while his wife reported "potentially violent" behavior, the RFC allows occasional contact with the public and coworkers. *Id.* (*citing* Tr. 17). Plaintiff also faults the ALJ for neglecting to restrict contact with supervisors as well as the public and coworkers. *Id.* He notes that Dr. King found that social contact with supervisors "should not be extensive." *Id.* at 14-15 (*citing* Tr. 360).

Contrary to Plaintiff's argument, Drs. Sherman's and Fuerst's findings contain support for the RFC (Tr. 19). The ALJ noted that Plaintiff's post-chemotherapy IQ, as found by Dr. Sherman, was only eight points below the premorbid score of 99 and that Plaintiff demonstrated good communicative skills (Tr. 13). The ALJ acknowledged Dr. Sherman's finding that Plaintiff's "neurobehavioral functioning may present a barrier to return to competitive employment" (Tr. 13). However, the ALJ reasonably discounted this finding on the basis that (1) Dr. Sherman "did not specify her perception of 'competitive employment,'" and, (2) the assessment was made within a few month of the end of chemotherapy and that the more recent records showed improved cognitive and behavioral function (Tr. 13). The ALJ did not err in rejecting Dr. Sherman's finding that Plaintiff was possibly barred from competitive employment. The Commissioner, not a treating or consultative source, is

-17-

responsible for deciding whether a claimant meets "the statutory definition of disability." 20 C.F.R. § 404.1527(d)(1). While a treating source opinion regarding a claimant's medical condition is entitled to deference, the SSA "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." § 404.1527(d)(3)(emphasis added).

As to Dr. Fuerst's March, 2012 findings, the ALJ noted that Plaintiff scored verbal, performance, and full-scale IQ scores of 94, 98, and 96 respectively, surpassing the scores found by Dr. Sherman (Tr. 18). The ALJ accorded only "minimal weight to Dr. Fuerst's opinion that Plaintiff should "'remain on disability,'" noting that the psychologist's clinical findings of low average to average memory and "'minimal personality difficulties'" stood at odds with the "disability" opinion (Tr. 18-19).

As stated by the ALJ, the RFC is based largely on Dr. King's June, 2012 non-examining assessment and conclusion that Plaintiff could perform "simple, unskilled tasks" but that "interactions with supervisors, coworkers, and the public should not be extensive" (Tr. 19, 345, 360). While it is true that the RFC did not contain a restriction on interactions with supervisors, the jobs of production worker and production worker/helper as described by the DOT, do not require "extensive," *i.e.*, unusually frequent interaction with supervisors or anyone else. *See* DOT #794.687-042, 794.687-058, 733.687-038.[3] Because none of the production-related job findings require "extensive" interaction with others, the ALJ's

_____

[3]http://www.occupationalinfo.org. (Last visited December 29, 2016).

-18-

omission of reference to supervisors is, at most, harmless error.

### B.  The ALJ's Heightened Duty

Plaintiff, proceeding without representation at the hearing, also argues that the ALJ failed to fully develop the record.[4] *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000).  *Plaintiff's Brief* at 15-16, Pg. ID 484.

Plaintiff is correct that while an ALJ cannot properly assume the role of counsel, "he acts as an examiner charged with developing the facts." *Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1051 (6th Cir. 1983); *Richardson v. Perales*, 402 U.S. 389, 411 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971). Where a claimant is unrepresented at the hearing, "the ALJ has a duty to exercise a *heightened* level of care and assume a more active role" in the proceedings. *Lashley,* at *1051(citing Smith v. Harris*, 644 F.2d 985, 989 (3d Cir. 1981))(emphasis added).

The transcript does not support Plaintiff's argument that the ALJ failed to exercise a heightened duty of care.  The ALJ adjourned the original hearing to allow Plaintiff more time to obtain counsel or a non-attorney representative (Tr. 81-82).  The hearing at which Plaintiff testified lasted for over an hour (Tr. 31-78).  The ALJ composed a hypothetical question including limitations to "low-stress" work, with only occasional decision-making, changes

---

[4]

While Plaintiff's former wife stated at the hearing that she would act as his "representative," her primary role at the hearing was as a witness (Tr. 32, 60).  I agree with Plaintiff's contention that he was, for all practical purposes, unrepresented at the hearing.

in the work setting, and interaction with the public and coworkers (Tr. 72). The VE found that a significant number of positions existed, despite the highly restrictive hypothetical question posed by the ALJ which would allow for only "the simplest of the simplest jobs" (Tr. 72). The ALJ allowed Plaintiff's former wife to testify and later considered her claims that Plaintiff minimized his cognitive limitations (Tr. 18-20, 60-65).

Moreover, the ALJ's conclusion that Plaintiff was no longer disabled is well supported and explained. The ALJ cited Plaintiff's June 5, 2012 Function Report (prepared by Plaintiff and his former wife after Plaintiff had been informed that his benefits had been terminated) stating that he was unable to perform self-care tasks or other activities without help (20, 250-257). The ALJ noted that in contrast, Plaintiff and his wife reported in August, 2010 that Plaintiff was independent in "all basic activities of daily living, including meal preparation and driving" (Tr. 21). The ALJ noted that the 2011 and early 2012 treating records showed that the cognitive limitations brought on by chemotherapy had largely resolved (Tr. 21).

My own review of the 2011 and 2012 records is consistent with the ALJ's findings that Plaintiff's cognitive condition improved in the two years following chemotherapy (Tr. 290, 332, 342, 406). While Plaintiff's former wife testified that Plaintiff exhibited aggressive and unpredictable behavior, none of the treating records suggest an inappropriate or hostile affect. To the contrary, the "disability opinions" by treating and consultative sources do not appear to be based on Plaintiff's demeanor or test scores, but rather, Danielle Krikorian's

-20-

allegations.  For example, Dr. Sherman's August, 2010 observations of average intelligence, mild cognitive disorders, and an appropriate affect (Tr. 285-287) contrast with Ms. Krikorian's claim that Plaintiff was inconsiderate, rude, and verbally aggressive (Tr. 284-285).  Likewise, while in March, 2012, Dr. Fuerst observed that Plaintiff appeared psychologically well-adjusted, fully oriented, was able to achieve average IQ scores, and had fluent speech (Tr. 339-341), Ms. Krikorian reported poor hygiene, and aggressiveness (Tr. 338).  Dr. Fuerst acknowledged that his conclusion that Plaintiff should remain on disability was based in part on Ms. Krikorian's report (Tr. 338).

Further, while in October, 2013, Dr. Marcarian opined that "it would be impossible" for Plaintiff "to seek and maintain employment in his current condition" (Tr. 366), the treating records from the same day state that Plaintiff did not exhibit anxiety, memory loss, or confusion (Tr. 400).   Ms. Krikorian's claims that her former husband was "violent and aggressive," unhygienic, and verbally abusive are further undermined by her testimony that she allowed their eight-year-old son to remain in Plaintiff's care on weekends (Tr. 65-66).

Based on a review of this record as a whole, I find that the Commissioner has met her burden to show that Plaintiff's disability ended as of February 9, 2012.  *Kennedy, supra,* 247 Fed.Appx.  at 765, 2007 WL 2669153, *4; 42 U.S.C. § 423(f)(1).

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #20] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen _____
R. STEVEN WHALEN
United States Magistrate Judge

Dated: January 2, 2017


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 2, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla _____
Case Manager